### ALLUM *et al. v.* UNITED STATES (No. 1114).[1]

MANUFACTURES OF FUR.

These dogskin mats have been given a form other than that of the natural skin and have in trade a characteristic name. They are furs, ready to be applied, after incidental cleaning or dyeing to their final use as furs. They are dutiable under paragraph 439, tariff act of 1909.—United States *v.* Richter (2 Ct. Cust. Appls., 167; T. D. 31680).

United States Court of Customs Appeals, May 26, 1913.

APPEAL from Board of United States General Appraisers, Abstract 31260 (T. D. 33194).

[Affirmed.]

*Walden & Webster* for appellants.

*William L. Wemple,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel; *Leland N. Wood,* assistant attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

This case involves pieces of dogskin sewn together in the form of rectangular mats, about 24 by 40 inches in size, the trade designation of which seems to be "dogskin mats" or "mats."

No witnesses were called on behalf of the Government, while several testified for the importers. Upon the evidence the Board of General Appraisers found the merchandise to be—

Pieces of dogskin temporarily sewn together in the form of mats; * * * that the sewing of the pieces together is of a temporary character; that the mats are never used in the form in which they are imported; that the sewing of the pieces together

---

[1] Reported in T. D. 33526 (24 Treas. Dec., 985).

serves no purpose unless it may be convenience in transportation; that they are, after importation, ripped apart, rematched, and, in many instances, cleaned and dyed, and that the more general use of the pieces is the making thereof into coats or linings for the same.

To more completely describe the merchandise it should be added, assuming always that the sample before us is typical of the importation, that each mat is of substantially uniform color; that the dogskins from which the pieces came had been dressed with the hair or fur on; that each piece in a mat (there are some 40 in the sample) had been cleanly cut for the purpose of fitting it with its fellows to make the mat; and that the sewing thereof, although found by the board to be of a temporary character, suggests by its appearance that it is able to serve more than a temporary purpose.

The mats were assessed at 35 per cent ad valorem under paragraph 439 of the tariff act of 1909, which assessment was upheld by the board on the authority of United States *v.* Richter (2 Ct. Cust. Appls., 167; T. D. 31680).

The importers claim duty should have been taken at 20 per cent ad valorem under the same paragraph, or if not directly dutiable thereunder then by similitude under paragraph 481, or if not so then dutiable under paragraph 480 as an article manufactured in whole or in part, not otherwise provided for.

We insert here paragraph 439:

Furs dressed on the skin, not advanced further than dyeing, but not repaired, twenty per centum ad valorem; manufactures of furs, further advanced than dressing and dyeing, when prepared for use as materials, including plates, linings, and crosses, thirty-five per centum ad valorem; articles of wearing apparel of every description, partly or wholly manufactured, composed of or of which fur is the component material of chief value, fifty per centum ad valorem. Furs not on the skin, prepared for hatters' use, including fur skins carroted, twenty per centum ad valorem.

The first question is whether these dogskin mats are manufactures of fur, further advanced than dressing and dyeing, and prepared for use as materials.

The case of United States *v.* Richter, *supra,* is much in point on this question. The merchandise there was dressed pieces of sheepskin sewn into rectangular shapes, 64 inches long and 30 inches wide, in the form of rugs, under which name they were known to the trade. After importation they were taken apart, the poor pieces, if any, cut out, good pieces rematched if necessary and resewed and either lined and made into rugs or converted into carriage robes, overcoats, or other things of that nature. It was contended there as here that these skins were not manufactures of fur further advanced than dressing and dyeing, that they were not prepared for use as material within the meaning of the paragraph, and that whatever preparation

had been given them was wholly for convenience in transportation. The latter claim was doubted, in view of the appearance of the rugs themselves, and it was said:

The goods which are the subject of this appeal are made of dressed fur skins which have not been dyed, and the point is made that they are not further advanced than dressing and dyeing. We think that the phrase "further advanced than dressing and dyeing," as used in paragraph 439, was intended to mark a step in the process of manufacture, and that whether furs have been so advanced is to be determined not by whether they have been actually dressed and dyed, but by whether they have passed beyond the dressing and dyeing stage in their manufacture. Furs may be and are made up into articles without dyeing them at all, in which case it would seem that they had gone beyond the dressing and dyeing period of their development. As already indicated, the furs utilized in making the rugs under consideration have lost their identity as mere furs. By processes of manufacture they have become articles of fur, namely, rugs, and are therefore, in our opinion, "manufactures of furs further advanced than dressing and dyeing."

As applied to the merchandise in the case at bar it may be added, as might well have been said in the Richter case, that the pieces of fur of which the merchandise is composed have been cut from the original furs dressed on the skin and by that operation the waste pieces of the skin in its natural shape, which could not be used for the purposes for which these pieces may be used or which were waste, have been discarded and nothing but the dressed fur skin which is suitable and adapted for further or final use remains. So far as this case shows these pieces, when used, do not have to be recut and certainly if recut are subject to a relatively small loss in the material and less than would probably happen in the cutting up of the original skin for the same use.

In Carlowitz v. United States (2 Ct. Cust. Appls., 172; T. D. 31681) the same paragraph was under consideration. The merchandise there was fur crosses. In the opinion it is said in substance that the words "including plates, linings, and crosses" brought within the expression "when prepared for use as materials," furs made up into plates, linings, and crosses whether or not the same were dressed or dyed.

In this connection, it may be observed that one of importers' witnesses in this case testified that the only difference between a fur plate and these mats was in the size, that it took 6 or 7 mats to make a plate, and that both fur plates and crosses after being imported were generally ripped apart and dyed before being used; that another, said he did not know the term plates in the fur trade; that another who knew of the term, said it was a lining made up ready for a garment, and that as to fur crosses he did not know whether they were ready for use or not; and that still another said that although he had heard of the trade term "fur plates" he did not handle goods within that description, but did handle lambskin furs, known as Chinese

crosses, which crosses, he said, were taken apart before being used by fur manufacturers.

The fact that by one witness at least no general difference except of size is shown to exist between these dogskin mats and fur plates, except perhaps an implied difference as to the *kind* of fur, and that by another it appears that some fur crosses before being used must be treated in a manner like these mats, gives some force to the Government's contention in this case that these dogskin mats in material, form, use, and state of preparation are closely analagous to the plates and crosses referred to in the paragraph and which are there declared to be prepared for use as materials.

The record also shows that one of importers' witnesses testified that these mats were used very largely for coat linings for making farmers' coats; that before being so used they were cut apart and cleaned by putting the same into drums for the purpose; another, that he used them mostly for making men's coats and a few for women's wear, that he cleaned and ripped them apart, rematched and afterwards dyed them; another said that he ripped them apart, cleaned and dyed them before making them into 'ladies' garments; and still another, a manufacturer of fur coats, testified that before he could use them they had to be cleaned and dyed and *then* taken apart and matched up with the skins in other mats.

We think these statements of importers' witnesses lead to the conclusion that these mats, if it be conceded that they are not designed to be used as mats, are composed of pieces of dressed fur skins suitable and ready according to the requirements of the manufacturer who finally receives them to be made up into the particular articles of his trade. They have been given a form other than that of the natural skin and have assumed in trade a name characteristic to themselves. Before being made into garments they may naturally require some cleaning. If the color was not suited to the requirements of trade or the demands of a particular purchaser, they would be dyed, and that they can be cleaned and dyed as an entirety or in pieces is indicated by the evidence. Whichever method is pursued, the pieces of skin of which the mats are composed are material prepared for use, the essential part of the preparation beyond that of dressing being that waste fur has been removed from the original fur skin, resulting in sound, usable fur, ready to be applied, after a further incidental cleaning or dyeing has been done, to their final use.

We may seem to disagree with some of the findings of the board, in view of the testimony and the exhibits, yet it only results in presenting stronger reasons than appear in its decision for upholding its judgment.

We think the merchandise is dutiable as assessed and the judgment of the Board of General Appraisers is therefore *affirmed.*