AYRES, BRIDGES & CO. ET AL. *v.* UNITED STATES (No. 1717).[1]

1. CONSTRUCTION, PARAGRAPHS 650, 286, 304, AND 348, TARIFF ACT OF 1913—"WOOLS"—"HAIR"—"FURS."

Dressed animal skins with the wool or hair on are not, when it is not profitable to separate the wool or hair from the skin and use it for wool or hair purposes, within,

---

[1] T. D. 37201 (32 Treas. Dec., 570).

the terms "wools" or "hair" (pars. 650, 286, and 304, tariff act of 1913); they are, if devoted to fur uses, within the term "furs" (par. 348). The term "furs" is not limited to products of strictly fur-bearing animals, but includes sheepskins with wool on, when devoted to fur uses, and not bearing so great an amount of wool as to make it commercially practicable to remove the wool and use it for wool purposes.

2. Sheepskins Devoted to Fur Uses.

Sheepskins, entire or pieced by sewing in the shapes of rectangles and crosses, with the natural growth thereon and the flesh side dressed, used as ordinary fur skins are used, and not bearing so great an amount of wool as to make it commercially practicable to remove the wool and use it for wool purposes, are not classifiable as wools on the skin (par. 650, tariff act of 1913) or as wool advanced (par. 286) and are not within the definition of wool in paragraph 304. They are dutiable as "furs dressed on the skin" (par. 348).

United States Court of Customs Appeals, April 23, 1917.

Appeal from Board of United States General Appraisers, Abstract 39471.

[Affirmed.]

*Jules Chopak, jr.,* (*William L. Wemple* of counsel) for appellants.

*Bert Hanson,* Assistant Attorney General (*Charles D. Laurence,* special attorney, of counsel), for the United States.

[Oral argument February 15, 1917, by Mr. Wemple and Mr. Hanson.]

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

Barber, Judge, delivered the opinion of the Court:

As to the merchandise covered by many of the protests in these cases, it is said by the board to be composed of a variety of skins of different animals on which the collector assessed duty at the rate of 30 per cent ad valorem under paragraph 348 of the tariff act of 1913 as "furs dressed on the skin, not advanced further than dyeing;" and as to that covered by the remainder of the protests that it is "fur articles or fur material in a variety of shapes and conditions" assessed under the same paragraph at different rates of duty. This is accepted as a correct statement of the general character of the merchandise covered by the protests and the duties assessed thereon.

We insert here the pertinent provisions of paragraph 348:

Furs dressed on the skin, not advanced further than dyeing, 30 per centum ad valorem; plates and mats of dog and goat skins, 10 per centum ad valorem; manufactures of furs, further advanced than dressing and dyeing, when prepared for use as material, joined or sewed together, including plates, linings, and crosses, except plates and mats of dog and goat skins, and articles manufactured from fur not specially provided for in this section, 40 per centum ad valorem; articles of wearing apparel of every description partly or wholly manufactured, composed of or of which hides or skins of cattle of the bovine species, or of the dog or goat are the component material of chief value, 15 per centum ad valorem; * * *.

The appellants' claims are that the merchandise is entitled to free entry under paragraph 650 of the same act as "wool of the sheep, hair of the camel, and other like animals, and all wools and hair on

the skin of such animals;" that if not entitled to free entry the merchandise is dutiable at 8 per cent ad valorem under paragraph 286 as "other wool and hair which have been advanced in any manner or by any process of manufacture beyond the washed or scoured condition," it being claimed that paragraphs 650 and 286 are made applicable to the importations by paragraph 304, which provides that "whenever in this section the word 'wool' is used in connection with a manufactured article of which it is a component material, it shall be held to include wool or hair of the sheep, camel, or other like animals, whether manufactured by the woolen, worsted, felt, or any other process."

Claim is also made for a 5 per cent discount under subsection 7 of paragraph J of section 4 of the act. Other claims were made in the brief first filed, but are waived in the reply brief.

All the protests, of which there are a large number, were overruled by the board. We take it from the briefs of counsel that the only merchandise the classification of which is here contested is in fact the skins of sheep animals or parts of the same with the natural growth thereon, the flesh side of which has been dressed, rendering the same soft and pliable.

Four exhibits are before us, one of which has no distinguishing mark thereon, but, as we understand, is the exhibit referred to in a stipulation contained in the record and which precedes the introduction of oral testimony. This will be hereinafter referred to as Exhibit A. This stipulation was made, signed, and filed by counsel. It is therein stated that the merchandise covered by protest 795190 consists of small pieces of sheepskins, irregular in size, sewed together in rectangular shapes about 64 to 66 inches in length and about 28 to 30 inches in breadth, dressed on one side, with the natural growth on the other, and is represented by a sample (our Exhibit A) which is to be received in evidence and that the testimony taken in protests 762536, etc., Ayres, Bridges & Co. et al., may be considered in determining the classification of the merchandise covered by said protest 795190. No reference to this exhibit appears to have been made in any of the testimony taken before the board, nor is it again alluded to in the record. The stipulation correctly describes Exhibit A.

The evidence in the Ayres, Bridges & Co. et al. case then follows, from the record of which it appears that the importers called Mr. Hare, a customs examiner, who was asked if a sample shown him correctly represented some or all of the merchandise on an invoice in protest 758640, which is the number of the protest in the case of A. Herskovits & Son. He testified that it did, that it represented dressed taluppen skins, and that a taluppen was a sheep or lamb skin from the southern part of Russia, but whether of a mature

sheep or lamb he was unable to say. The sample was marked "Exhibit 1." Thereupon the importers rested.

Upon examination by the Government's counsel, which seems to have exceeded the limits of cross-examination, he gave further testimony to the effect that he had in his capacity of examiner of merchandise been familiar with goods of this character for eight years; that they were brought to this country by importers of fur skins; that the use of skins similar thereto was as coat linings for men's coats; that in the course of his duties as examiner he had examined and passed upon Thibet lamb, slink lamb, Persian, Astrakhan, and Caracul, all of which were of sheep origin; that they were imported and dealt in by importers of fur skins and thereafter handled by furriers who made up garments and were made into garments; and that said Exhibit 1 and the various other skins mentioned by the witness had been, since the latter part of October, 1907, when dressed, or dressed and dyed, regarded for customs purposes as dressed furs on the skin.

The Government thereupon called two witnesses in its behalf, whose business was the importing of furs and whose relevant testimony in substance was that Exhibit 1 was a Bulgarian sheepskin, with which and other similar merchandise, including Thibet, Astrakhan, Persian lamb, Caracul, and slink, the witnesses were familiar; that the Bulgarian sheepskin was or had been imported by them; that it and the various other skins mentioned were known as fur skins in the wholesale trade; that the Bulgarian skins, as well as the others mentioned, were made into coats and other garments by manufacturers of fur, and had been treated for years as furs in customs administration.

An extended cross-examination of these witnesses developed that, in fact, all these different skins were bought and sold in the trade under a name indicating the animal from which the skin was taken or the geographical location from which it came, or both, and that the word "fur" was not used in that connection; but the witnesses still insisted that they were known as fur skins in the wholesale trade dealing therewith and that their use was chiefly in the manufacture of coats or linings therefor. The Government then rested.

Thereupon the appellants called five witnesses, who were importers.

The first (Cookman) did not handle Bulgarian sheep, but did handle the skin of the sheep animals of Asia, such as the Persian, Thibet, and China skins, and also handled the skins of other animals. He testified that the skins he handled were sold to various classes of business—namely, furriers, manufacturers of leather, and some others, under a name indicating the kind of animal from which they came, or the place, or both. He was not asked and did not state whether or not they were within the commercial designation of fur skins. He sometimes

sold sheepskins with wool on to leather manufacturers, from whom he later obtained the wool itself.

Another witness (Lander) handled dog, goat, sheep, and lamb skins, including Thibet and Persian lamb and China sheepskins, all of which, he said, were known in the trade by names indicating the animal or place of origin, substantially as testified to by the preceding witness, and which he sold to tanners and coat manufacturers, the China sheepskins being sold in about equal quantities to each; that those used by the fur manufacturers were made into what the witness called imitation of or substitute for fur, or imitation fur garments; that China sheepskin, China, Thibet, and Persian lamb skins were not included in the trade he dealt with under the class of furs, which class, so far as his business was concerned, the trade limited to fox, marten, and seal skins.

Another witness (Stephens) testified that he imported sheep animal skins of Chinese origin, including China lambskins, and also was a dealer in furs; that the trade did not include such China sheep and lamb skins as he imported in the definition of furs; that the trade accepted the word "furs" to mean the valuable skin of an animal with fine fur on it, such as the fox, the squirrel, the skunk, but did not include the cat or the rabbit; that in the trade the use of any particular skin had nothing to do with the question of whether or not it was a fur skin; that he sold lambskins and sheepskins to the leather and skin trade, meaning by leather trade those who might handle fur skins; that he sold skins, like Chinese sheepskins, more to people engaged in the leather business than to anybody else, but sold some to dealers in fur skins; that fur skins were used in making coats, neck pieces, muffs, and so on; that although sheep and lamb skins were put up in that shape, it did not, in his opinion, constitute them fur articles.

Another of the importers' witnesses (Weil) had imported China lamb, Thibet lamb, Bulgarian sheep, Astrakhan, Caracul, slink, etc., although at the time of his testimony he was not importing all of them. He said that the term "furs" was not used in the trade as referring to any of the before-mentioned skins; neither was it when referring to the skin of the fox, the bear, or the sable; that all were referred to by the name of the animal from which they were taken; that all were classed by the trade as furs; that his importations were sold to furriers or fur dealers; that he had no dealings with leather manufacturers and did not know that any of the skins concerning which he testified went to them. None of the last four named witnesses for the importers were shown any exhibits in the case or any sample skins so far as the record discloses.

The last of the importers' witnesses (Bleistein) produced a sample marked "Exhibit 2," which he testified correctly represented the mer-

chandise invoiced in protest 779602; also another marked "Exhibit 3," representing the merchandise in protest 773476, each of these being among the protests of M. S. Elias, jr., and included in the lists of protests in these cases. What animal skins these two exhibits represented the witness did not definitely testify nor did any witness undertake to state what they were.

Mr. Bleistein also testified that he handled various skins of sheep origin, such as Thibet and slink, also goat and dog skins, but not China sheepskins. Some of these skins, he said, were made into crosses, the crosses in turn, especially those made of slink lamb—and it is possible the witness referred to Exhibit 3 as being a "slink cross"—being made into glove linings; also into rugs for baby carriages. He did not deal in Bulgarian lambskins. He sold mainly to the leather and fur trades; also some to the manufacturers of hatters' fur. He did not know the principal uses to which the merchandise he sold was put by the purchasers thereof, nor did he undertake to give their trade designation other than it may perhaps be inferred that the skins were designated by the name of the animals producing the same. He also testified that at times practically all the skins he bought were used to make furs, and at times not, depending upon the condition of the market.

It will be noticed that the evidence of the last five witnesses does not describe the merchandise which is the subject of these appeals further than to say that Exhibits 2 and 3 represent some of it, nor is this evidence connected with the samples, except as to the Bulgarian sheep, with any degree of certainty. It does not tend to establish the commercial designation of any thereof other than what may be inferred from the testimony that the skins of animals of the sheep kind, as well as others, were known either by the name indicating the animal from which taken or the place of origin, or both, and that those of the sheep kind concerning which they testified were not known as furs; neither does it show the uses to which the merchandise of which the samples are typical is applied unless by inference, which is uncertain.

As to Exhibit 1, the skin of the Bulgarian sheep, it appears to be an entire skin covered with a curly, black growth, the maximum length of which is about 3 inches, much being shorter. There are some things about its appearance which indicate that the color is the result of dyeing, but of this we are not certain.

Exhibit 2 is composed of two or three pieces firmly sewed together and is in the shape of a small skin covered with a thick, fine, silky, curly, wooly growth thereon, the approximate greatest length being about 3 inches, much being shorter.

Exhibit A is covered with what may be termed a wooly growth, the maximum length thereof being 7 or 8 inches. The most of it is

shorter and the exhibit is, as already appears, rectangular in shape and composed of a considerable number of pieces firmly sewn together.

Exhibit 3 is in the shape of a cross, is composed of various pieces also firmly sewn together and is covered with a curly, wooly growth, the maximum length of which appears to be about 1½ or 2 inches.

The color of the growth on all the exhibits except the Bulgarian sheep is a white or a yellowish white and apparently the natural color.

Disregarding for the time being any question of the importers' failure to connect their evidence with exhibits before us, it is apparent that the gravamen of their case is that because the importations are the dressed skins of the mature or immature animals of the sheep kind having the wool thereon, they are not classifiable as "furs dressed on the skin" or "manufactures of fur" within the meaning of paragraph 348, but are classifiable under some of the various invoked provisions for wool or manufactures thereof either as entitled to free entry or dutiable at rates lower than those imposed thereon under paragraph 348.

This raises the question of whether sheep or lamb skins dressed with the wool thereon are or are not furs or fur skins in the common acceptation of the term. This question in principle has been the subject of much litigation and has resulted in departmental procedure and adjudications by the Board of General Appraisers and the courts that have not always been easy of reconciliation. We think it is unnecessary, in view of the provisions of the act of 1913, to enter into an extended discussion of the subject.

In United States *v.* Heckman (1 Ct. Cust. Appls., 272; T. D. 31318), decided in February, 1911, raw Australian sheepskins with short wool thereon were held to be "fur skins, dressed," and entitled to free entry under the act of 1909. The case of United States *v.* Bennet (66 Fed., 299) was cited with approval and the judgment of this court was founded upon the principle that sheep and lamb skins when carrying so small an amount of wool thereon as to render them suitable exclusively for fur purposes and which were used therefor were in fact and in the law regarded as fur skins. Among other things, it was said that the practice, which it appeared had for a long time obtained notwithstanding the stringent provisions of various tariff acts for a high rate of duty upon wool, of regarding such skins as fur skins for tariff purposes, had, in view of reenactments by Congress without change of the various statutes relating to the subject matter, resulted in a legislative adoption of the principle that when it was not profitable to separate the wool from the skin and use it for wool purposes, such skins if devoted to fur uses were, in the tariff sense as well as common understanding, fur skins.

In United States *v.* Richter (2 Ct. Cust. Appls., 167; T. D. 31680), decided in May, 1911, we held that dressed sheepskins sewed together

into rectangular shapes were articles of fur rather than partly manufactured articles not otherwise provided for, the question of whether they were dutiable under any wool paragraph apparently not being raised.

In Carlowitz v. United States (2 Ct. Cust. Appls., 172; T. D. 31681), decided in May, 1911, kid skins and slink lambskins dressed and dyed with the hair or wool on and temporarily sewn together into the form of crosses, the ultimate use of which was to make garments or rugs, were regarded as furs.

In Revillon Frères v. United States (2 Ct. Cust. Appls., 209; T. D. 31948), decided October, 1911, dressed pony skins covered with hair, not wool, were held to be fur skins upon the ground that trade usage and custom had so far crystallized as to give them that commercial designation, although not strictly within the meaning of the word "fur" as defined by the dictionaries.

In Allum et al. v. United States (4 Ct. Cust. Appls., 332; T. D. 33526), decided in May, 1913, dressed dogskins with the hair on, imported in the form of mats—that is, various pieces sewn together resulting in a rectangular shaped article which was very largely used as mats—were held dutiable as furs dressed on the skin.

In Goat and Sheepskin Import Co. v. United States (5 Ct. Cust. Appls. 178; T. D. 34254), decided in January, 1914, Russian lambskins, evidently not dressed, were held not to be dutiable under the wool paragraphs of the act of 1909. The question of whether they were fur skins or skins, raw, however, was not determined because in either event they were entitled to free entry.

It will be observed that all these cases, excepting the one last cited, were disposed of before the enactment of the tariff act of 1913, the provisions of which we are now considering, and it will therefore be presumed that Congress had knowledge thereof in the enactment of its provisions. In some of these cases it was contended in effect, as it is contended in the instant case, that animals of the sheep kind were not fur-bearing animals and hence their skins with the natural growth thereon could not be deemed a fur or a fur skin within the common meaning of those terms.

One import of these decisions is that the term "fur" or "furs" or "fur skins" was not in common understanding necessarily limited to products of strictly fur-bearing animals and that the skins of animals of the sheep kind carrying a relatively short growth of wool thereon and not commercially valuable as wool or designed to be used as such, were not dutiable under the wool provisions of the act of 1909 but were, because of their exclusive use in the manufacture of what are ordinarily known as furs or fur articles, deemed to be for tariff purposes furs in fact and that the trade had come to so regard them.

Paragraph 348 of itself, we think, evidences that Congress recognized that dressed skins of the dog and goat in the form of plates and mats are to be regarded as a kind of fur and that plates, linings, and crosses of skins of other animals with hair or short wool thereon and without limitation as to the kind of animal may likewise be so considered.

Examining this paragraph in that view and also in the light of the decisions above referred to, we entertain no doubt that Congress thereby intended, regardless of how it had otherwise, if ever, viewed the matter, that dressed skins of animals, other than those of the strictly fur-bearing species and including those of the sheep kind, should be classified thereunder as furs dressed on the skin or as manufactures of furs whenever it appeared that they were, if skins of the animals of the sheep kind, designed for such use and were so used, coupled probably with the qualification that at least in the case of skins of sheep animals they should not carry so great an amount of wool thereon as to render them practically and commercially wool and make it commercially practicable that the wool thereon should be removed therefrom and used for the various purposes to which wool, as such, ordinarily is devoted.

Indeed, we have little hesitation in saying that in their common meaning the terms "fur," "furs," and "furs dressed on the skin" include the dressed skins of animals of the sheep kind when such skins are in fact designed and wholly or chiefly devoted to the manufacture of furs or fur articles such as coats, muffs, neck pieces, etc. So far as we can see such skins serve all the purposes of fur and the well-known scarcity and the cost of many skins of the so-called true fur-bearing animals has resulted in their widespread and general use in the manufacture of what are commonly known as fur garments or articles, or garments and articles composed in part of fur. Manifestly, however, as already stated, such a meaning would be applied to the skins that carry a relatively short growth of wool or a growth not relatively and commercially valuable if separated therefrom.

In this view it is unnecessary to consider the several arguments designed to establish that these dressed skins are dutiable under the various wool paragraphs referred to by importers to which allusion has already been made.

The condition of the merchandise here, so far as shown by the exhibits, militates strongly against the contention of the importers that it is to be regarded as wool or hair or a manufacture thereof for any tariff purpose or in any tariff sense. These skins have all been dressed on one side, rendering them soft and pliable. The growth on the other side in the main is not of considerable length, which suggests that they are not imported for wool or hair purposes as such,

because, if so, the dressing was unnecessary. They have been apparrently designed and set apart for fur uses and are appropriate therefor. Exhibits A and 3 are composed of pieces of such skins firmly sewn together, the result being in the one case a rectangular rug or plate and in the other a cross. While there is no testimony to that effect, it is obvious that these two exhibits are composed of pieces either selected and prepared for that purpose, or that pieces not selected have been cut or trimmed to appropriate sizes, so that when united with their fellows the result is a definite predetermined form or shape, a cross or plate, articles which are specifically described in paragraph 348 as forms of manufactures of furs.

There are some 115 different protests in this case, filed by 49 different importers.

All the merchandise under review has been assessed as furs dressed on the skin, not further advanced than dyeing, or as fur articles, or as fur material under paragraph 348, and this assessment is presumed to be correct. The presumption carries with it the conclusion that the merchandise, although the dressed skins of animals of the sheep kind with the wool thereon, is fur within the paragraph as construed. This in turn involves the conclusion that the wool is of such character that it is not commercially practicable to remove it and devote the same to the various purposes for which wool as such ordinarily is used and that it is not designed to be so used There is no proof that tends to show that the imported dressed skins which are represented by the exhibits before us carry so great an amount of wool as to be commercially valuable for wool purposes or are designed to be devoted thereto. Any evidence which tends to show that other importations of similar skins do carry a growth that is practically and commercially wool and used as such is not connected with the exhibits or importations here under consideration.

While some of the exhibits, notably A, contain a thickness and length of growth that might suggest the commercial practicability of separating the same from the skins and devoting it to wool purposes, yet we are unwilling upon this record, including the exhibits, to say of our own knowledge and in the absence of proof to that effect that any of these importations are not fur, furs dressed on the skin, or fur articles within the meaning of the paragraph as interpreted. Therefore, although we might incline to the belief that there is merit in the protests as to some of the merchandise before us, we do not feel justified in reversing the judgment below.

The importers rely upon an alleged error of the board in denying an application for a new trial before it for the purpose of enabling them to make proof upon the claim for a 5 per cent discount under paragraph J of section 4 of the act of October 3, 1913.

In view of the recent decision of the Supreme Court in what are generally referred to as the Five Per Cent cases, it is apparent that a reversal upon this issue would be of no avail to the importers, hence no discussion of the question is here indulged in or ground for reversal found therein.

The result is the judgment of the Board of General Appraisers is *affirmed*.