(C. D. 81)

DOMESTIC BROADTAIL PRODUCERS, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided January 19, 1939)

*John R. Rafter; Pickrell & McDonald*, associate counsel (*Daniel P. McDonald* of counsel), for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Marcus Higginbotham, Jr.,* special attorney), for the defendant.

Before McClelland, Sullivan, and Brown, Judges; Sullivan, J., concurring; McClelland, P. J., not participating

BROWN, Judge: This suit against the United States was brought at New York City and tried there to recover about $50,000 of customs duties claimed to have been illegally exacted on certain lambskins imported from the Argentine.

The collector of customs took duty as wool on the skins at 27 cents per pound of clean content under subdivision (a) of paragraph 1102 of the wool schedule of the Tariff Act of 1930, which reads as follows:

PAR. 1102. (a) Wools, not specially provided for, not finer than 44s, in the grease or washed, 29 cents per pound of clean content; scoured, 32 cents per pound of clean content; on the skin, 27 cents per pound of clean content; sorted, or matchings, if not scoured, 30 cents per pound of clean content: *Provided,* That a tolerance of not more than 10 per centum of wools not finer than 46s may be allowed in each bale or package of wools imported as not finer than 44s.

The plaintiff claims they are free of duty as undressed fur skins under paragraph 1681 of the free list of said act which reads:

PAR. 1681. Furs and fur skins, not specially provided for, undressed.

or in the alternative as free of duty under paragraph 1765 of the free list reading as follows:

PAR. 1765. Skins of all kinds, raw, and hides not specially provided for.

the former claim being principally relied upon.

As revealed by the record in this case, the skins in question are Lincoln lambskins (R. 8). They came from the Argentine, where they were *specially selected for fur purposes* and whence they were imported for fur purposes (R. 7–8). They were purchased from two fur dealers in the Province of Buenos Aires (R. 6–8) by Domestic Broadtail Producers, Inc., the plaintiff herein, which has been engaged exclusively in the fur business in this country for the last eleven years (R. 6). They were imported in a raw, undressed condition (R. 4–6) and, after their arrival in the United States, were processed into finished fur skins, known as American broadtail, by Jacob Becher and Brother, Inc., dressers and dyers of fur skins, which occupies the same building as is occupied by Domestic Broadtail Producers, Inc. (R. 12–13). When they had been processed into finished fur skins, they were sold by Domestic Broadtail Producers, Inc., to the furriers, to be made into fur garments, e. g., ladies' fur coats (R. 26–27). That was their exclusive use (R. 27).

Lincoln lambskins are a well-known variety of raw fur skins (R. 31–34, Collective Exhibit 4). American broadtail is a well-known variety of finished fur skins (R. 30–31)—so well known, in fact, as to be listed as such in the Encyclopaedia Britannica (14th Ed., Vol. 9, Plate III adjoining page 938).

The lambskins in question are of two sizes, and, as hereinafter indicated, the difference in their sizes is reflected in the purchase prices thereof. The three skins which are marked in evidence as Collective Exhibit 1 in this case are agreed to be truly representative of the larger skins in question. The three skins which are marked in evidence as Collective Exhibit 2 in this case are agreed to be truly representative of the smaller skins in question (R. 4, 34 and stipulation re samples).

That the lambskins in question were specially selected for fur purposes is evidenced, not only by the fact that they were purchased from fur dealers in the Province of Buenos Aires in the Argentine (R. 7–8) but also by the affirmative testimony of the president of the plaintiff corporation, who personally bought them on a trip to the Argentine for that purpose in the Fall of 1936 (R. 7), which trip, incidentally, was only one of many similar trips which he had made to the Argentine, beginning with the year 1927, for the purpose of buying the same kind of skins for fur purposes (R. 10). This witness testified that there were actually two selections of the skins for fur purposes—the first, a selection by the slaughter house, and the second, a more careful selection by the fur dealer (R. 10–11). He also enumerated the bases or criteria for the selection of such lambskins for fur purposes, namely, (1) that they must be skins from Lincoln lambs, either of pure breed or of a cross-breed in which the Lincoln strain predominates; (2) that they must be taken from lambs of not more than four months of age and must be limited as to size; (3) that the hair on the skins must have a curl which extends right down to the pelt and must have "character"; (4) that the skins must be free from scabs and must be taken from animals which were not diseased; and (5) that the skins must be free from damage (R. 8–9, 11). In explanation of these requirements, he stated, among other things, that a curl in the hair, which goes right down to the pelt, is essential in order to obtain a so-called "moiré" pattern or wavy effect in the finished fur skin (R. 9). He also stated that, if the skins were too large, this pattern would be spread out too much, and that the pelt would be too heavy or too thick for fur purposes (R. 9–10). The moiré pattern referred to is plainly discernible in the finished fur skins (R. 44 and Collective Illustrative Exhibits E, F, and G).

The same witness then described in some detail the method of processing the undressed fur skins in question into finished fur skins (R. 13–14). That processing included dressing, shearing, dyeing, and finishing (R. 19). The shearing incident to the processing of the fur skins consisted of about fifteen separate shearings in the case of the larger skins (represented by Collective Exhibit 1) and of about ten separate shearings in the case of the smaller skins (represented by Collective Exhibit 2) (R. 21–22, 25). The shearing was done on a machine in which the cutting instrument resembles a lawn mower and operates on the principle of a lawn mower (R. 22–24). The many shearings required for that operation were explained as being due to the curl in the hairs on the skins and the different positions thereof as they came in contact with the cutting blades of the shearing machine (R. 22–25). Because of that curl, the witness explained, the shearing machine takes off only a little hair at a time and chops it into lengths varying from about one inch down to powder in the case of

the larger skins and from about three-quarters of one inch down to powder in the case of the smaller skins (R. 22–24, 43). He also testified that the shearing operation not only chops the hair into the variegated lengths referred to but also cuts off small bits of leather from the edges of the skins (R. 24, 45). He also said that the shearing is an essential operation in the processing of fur skins from their raw state to their finished condition, not only in the case of lambskins, but also in the case of other fur skins, such as rabbits, muskrats, beavers, and cats, and that, in the processing of such other fur skins, relatively as much hair is cut off in the shearing operation as is cut off in the processing of lambskins like those in question (R. 20–21). Also, that none of the hair which was sheared in the processing of the lambskins in question into finished fur skins was sold as wool, but that, on the contrary, all of it, varying in length from one inch down to powder and mixed with small bits of leather, was sold as *waste* to the Tanners Waste Corporation of the Bronx (New York, N. Y.), the only purchaser thereof (R. 26), without any attempt to separate the bits of leather from the hair, or to clean the hair, or to grade it according to length, quality, or otherwise (R. 27–28).

All the testimony above referred to was definite and positive in character and was not contradicted in any particular. It was supplemented by the physical exhibits showing the condition of the skins in question at the time of their importation (R. 4, Collective Exhibits 1 and 2), after they had been dressed (R. 14–17, Illustrative Exhibits A and B), after they had been dressed and sheared (R. 17–18, Illustrative Exhibits C and D), and after they had been dressed, sheared, dyed, and finished (R. 19–20, Collective Illustrative Exhibits E and F). In addition, samples of two unlined ladies' fur coats, made from some of the lambskins in question, were introduced in evidence (R. 28–29, Collective Illustrative Exhibit G).

That the skins in question could not, commercially and practically, be used for wool purposes is equally plain from the record. In other words, it was proven and we find as a fact herein that if the wool had been pulled from the skins in this country, and if the wool and the pelts were sold here, the proceeds of such sales, less the cost of the pulling, would be much less than the bare landed cost of the skins without including duty and without adding anything for the importer's overhead expense in such an undertaking.

The Government witnesses called in no way weakened the force of the plaintiff's case and, to some extent, corroborated it.

The record clearly establishes that these lambskins were especially selected and imported for fur purposes, that they were used exclusively for fur purposes, and that they are, in fact, undressed fur skins, also that they could not be used for wool purposes commercially and practically.

In *United States* v. *Bennet*, 66 Fed. 299, the Second Circuit Court of Appeals, per Shipman, Circuit Judge, found that certain raw Angora goat skins, with the hair on, were undressed fur skins for all commercial purposes and that it was unprofitable to separate the hair from the skins, as in the case at bar, to use the hair as wool.

In reversing the decision of this court per Sharretts, J., in T. D. 12815, G. A. 1411, it was said:

> Raw Angora goat skins with the wool on, are used exclusively as fur skins, and for no other purpose than as fur. It is not profitable to separate the hair from the skins, and to use the hair as wool. They are for all commercial uses undressed fur skins, and while they are also, literally, undressed wool skins, or skins with the wool on, their classification for tariff purposes should not be under the head of "wools," because practically they are not such. While bearing the name of "wool," they are not the wools to which the wool schedule relates, and it is too close an adherence to literalism to classify them as something which they are not.

Judge McClelland of this court in the *International Hide and Skin Co.* case, T. D. 29119, Abstract 19296, 15 Treas. Dec. 675, made a very careful analytical statement of the essentials of proof in this class of cases. In that case certain China sheepskins, with the wool on, had been purchased indiscriminately and imported unsorted without regard to use and were not shown to have been used as furs. In holding, therefore, that they were not free of duty as fur skins under paragraph 562 or under paragraph 561, Tariff Act of 1897, as furs undressed, but dutiable as wool on the skin, Judge McClelland said:

> * * * In Abstract 17754 (T. D. 28634) the Board passed upon and determined a similar question in favor of the protestants' claim, but in that case, while it appears that the skins were of the China sheep, as in the case at bar, they were shown to have been carefully selected for use in the making of fur coats, while the record here shows that the skins involved were unsorted and purchased indiscriminately without regard to any particular use to which they might be adapted. This is shown by the testimony of the secretary of the importing company:

> Q. Do you know what these skins are used for?—A. Yes, sir.
> Q. What is their use?—A. Principally coats.
> Q. Did you sell them to manufacturers of fur coats?—A. Some of them might have been sold to a mitten manufacturer or a glove manufacturer; it is pretty difficult to state without referring to our books.
> Q. Are the skins of a special character?—A. Why, the short and the medium hair skins are sold for fur coat purposes and the long fur, the skins are sold to mitten manufacturers to make a mitten out of.

> *        *        *        *        *        *        *

> Q. You purchased these skins indiscriminately in China, or did you purchase them as fur skins?—A. Why, they are purchased indiscriminately.

> It also appears from the testimony of this witness that one-third of the importation involved in protest 284738 was sold unsorted to a tanner to be made into leather. Since there was no separation of the skins claimed to be suitable for use only in the making of fur coats from the ordinary skins with the wool on, it is impossible for the Board to make a finding of the percentages of each, and therefore the protests must be overruled and the decision of the collector in each case affirmed.

The Circuit Court for the Southern District of New York in affirming this judgment in *International Hide and Skin Co.* v. *United States*, 177 Fed. 602 (1909), entirely approved Judge McClelland's statement and adopted it as their own.

See also *Frederick Faraone & Co., Inc.* v. *United States*, T. D. 49596, 73 Treas. Dec. 906, a case of similar character to that at bar, and *Ayres, Bridges & Co.* v. *United States*, 8 Ct. Cust. Appls. 87, T. D. 37201, where Judge Barber says, page 94:

> One import of these decisions is that the term "fur" or "furs" or "fur skins" was not in common understanding necessarily limited to products of strictly fur-bearing animals and that the skins of animals of the sheep kind carrying a relatively short growth of wool thereon and not commercially valuable as wool or designed to be used as such, were not dutiable under the wool provisions of the act of 1909 * * *.

Therefore, following the rule of proof as stated by Judge McClelland and the legal principles expounded in the decisions cited, judgment will issue sustaining the claim for free entry under paragraph 1681 and directing refund of all duty taken accordingly.

SULLIVAN, Judge: I concur in the result.