(C. D. 1436)

CAREY & SKINNER, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 26, 1952)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh* and *William J. Vitale*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: The merchandise at issue in this case consists of "Hair-on Calf Leather" imported from Holland Landing, Ontario, Canada. Duty was assessed thereon at the rate of 20 per centum ad valorem as a nonenumerated manufactured article under the provisions of paragraph 1558 of the Tariff Act of 1930. The plaintiff claims that the leather is properly dutiable at 10 per centum ad valorem under paragraph 1530 as garment leather, or at 12½ per centum ad valorem under said paragraph as leather used in the manufacture of shoes. By way of amendment of the protest, it was further claimed that said merchandise is properly dutiable at 10 per centum ad valorem or 12½ per centum ad valorem under paragraph 1530 (b) (4), or at 10 per centum ad valorem under paragraph 1530 (b) (5) or paragraph 1530 (b) (7), or at 12½ per centum ad valorem under paragraph 1519, Tariff Act of 1930, all claimed rates being established by modifications under the General Agreement on Tariffs and Trade, T. D. 51802, classification being claimed under the foregoing either directly or by similitude under paragraph 1559. Plaintiff also claims by way of an additional amendment that the merchandise is properly dutiable at the rate of 15 per centum under paragraph 1530 (b) (5), as modified by the General Agreement on Tariffs and Trade.

Counsel for the plaintiff, without abandoning other claims, relies principally upon the claim that the merchandise is leather made from "calf or kip skins," not cut into forms suitable for conversion into footwear. As such, it is claimed properly dutiable under paragraph 1530 (b) (4), Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, at the rate of 12½ per centum ad valorem for upper leather, and 10 per centum ad valorem for other types of such leather, reading as follows:

PAR. 1530 (b) (4). * * * and leather made from calf or kip skins, rough, partly finished, or finished, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear:

\* \* \* and upper leather made from calf or kip skins; all the foregoing, not cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear_____12½% ad val.

\*      \*      \*      \*      \*      \*      \*

Other_____ 10% ad val.

At the trial four well-qualified witnesses testified on behalf of the plaintiff. The first witness, William Addison West, the secretary-treasurer and general manager of Goodwin's Tannery, the shipper of the merchandise in question, is a graduate with a B. A. degree in chemistry from the University of Western Ontario. From September 1936, he was chemist for the upper leather plant of Canada Packers, Ltd., for 2 years, and then was appointed superintendent in charge of all its production, amounting to 5 or 6 million feet of leather a year. In 1946, he started a business with Mr. Goodwin, known as the Goodwin Tanners, Ltd.

George Frederick Holloway, the second witness, started in the leather business in 1917 with one of the largest tanners of side leather in the British Empire. He served 3 years there under technical experts. Later, he was with tanners in London, Ontario, and later in Hudson, Mass. Thereafter, he was employed by the Barrie Tanning Co., Ltd., of Barrie, Ontario, in charge of full production for 15 years. At the time of trial, he was a consultant for Canadian tanners and for some American tanners. At all times he was in close contact with the tanning industry in both Canada and the United States and was familiar with the various types and kinds of tanning of leather in these American countries.

David J. Foley, the third witness, is a salesman for the Crown Leather Co. He had been in the leather business for over 50 years, buying and selling leather, principally calf leather, cowhide leather, goatskin leather, and sheepskin leather. During the past 40 years, he had bought and sold leather throughout New England, as far west as St. Louis, and by correspondence with firms on the west coast.

Joseph E. Rubinate, the plaintiff's fourth witness, is a manufacturer's representative in the leather business. His experience extended from 1927, handling shoe leathers, bag leathers, calfskin, kid, side leathers, sheep, and patent leather.

Four exhibits were admitted in evidence. The official sample was marked in evidence as exhibit 1, representing the third quality of leather. A sample representing quality No. 1 on the invoice was admitted in evidence as exhibit 2, and a sample representing quality No. 2 on the invoice was admitted as exhibit 3. A small sample of bark-tanned steer-hide leather, as illustrative of other types of leather used in the leather trade with the hair upon it, was marked in evidence as exhibit 4. The samples representing the imported merchandise consist of small tanned skins, having very short hair on one side of

the skin. The skins are of a shape which indicates that they were merely cut from the carcass of the animal and processed by tanning, or preserving in some manner.

The first witness described the process of producing leather from raw hides as follows:

A. * * * the skins come to us from packing houses and have been temporarily cured by the addition of salt to the flesh side of the skin. That dehydrates the skin to a point where a putrefaction does not set in over a short period of time. So, the first operation in the production of leather is to wash the skin free of that salt and then in the production of shall we call it a conventional piece of leather the next preliminary step takes place, which is the removal of the hair from the skin. This is done by the addition, by immersing the skin in a solution of calcium hydroxide to which may be added other materials such as sodium sulfide or arsenic to speed up the process. After the hair has come loose, which can best be explained by saying that the hair is originally imbedded in a hair follicle which may extend a fraction, a very small fraction of an inch below the surface of the skin. That follicle is more or less dissolved and the hair becomes loose. Then the lime, which by immersion enters the skin, is next washed out. * * * The skin is at that point transferred into leather by the addition of, * * * a chromium salt and by leaving the skin immersed in a revolving drum for a period of a day the raw skin is transferred to leather. [Record page 4.]

The witness explained that the only difference in the skins before the court, and the process of tanning described, is that the second operation is omitted.

All of the witnesses on examining the skins in question identified them as the skins of the unborn calf which had been chrome-tanned into leather. Leather was described as animal skins which will no longer decompose. The witnesses were further agreed that whether the calfskins in question have hair thereon or not, they represent chrome-tanned leather, and that such leather is chiefly used as upper calf leather in the manufacture of shoes. The tanning of leather with the hair on was described as an ancient art. One witness remembered that such skins were used as the uppers of shoes as far back as the year 1923, and another since 1910. The witnesses were agreed that the hair on the leather does not affect its status as leather. In the last 3 years, one witness had sold 10,000 skins of hair-on calf leather to shoe factories as calf upper leather for boots and shoes. Two of the witnesses were familiar with exhibit 4, the hair-on steer hide, and knew of its use for mechanical purposes. These experts were agreed that there was no difference whatever between the skins of the unborn calf which were tanned with the hair on and such skins which had the hair removed. It was estimated by one of the witnesses that 80 per centum of such skins is used as uppers in the making of shoes without the hair and that 20 per centum contained the hair.

The evidence is uncontradicted that the hair-on calfskin in question is a well-known kind of leather which has not been cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear. Webster's

New International Dictionary, as well as Funk & Wagnalls New Standard Dictionary, defines leather as the skin of an animal when tanned or otherwise dressed for use. The uncontradicted testimony relative to the hair-on calfskins in question brings them directly within such common meaning.

In the case of *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902, the term "dressed" as applied to fur skins, was construed as referring to a skin which, after certain preliminary operations such as fleshing, has been tanned or leathered by being placed in a pickle of oil in a dressing bath, and has also been subjected to certain after-operations such as kicking or drumming to soften the skin, the application of oil or grease to the skin, and the cleaning thereof to remove excess dirt, grease, etc., acquired during the dressing process. The process applied to the calfskins in question to change them into leather, as described by all of the witnesses in this case, clearly is distinguished from the judicial definition of a dressed skin of an animal containing the hair or fur.

From the uncontradicted evidence produced in this case, it is clear that the hair-on calfskins in question are leather made from calfskins; that they are chiefly used as upper leather; and that they are not cut or wholly or partly manufactured into uppers, or any forms or shapes suitable for conversion into boots, shoes, or footwear. From such evidence, it is the holding of this court that the articles are properly dutiable under the provisions of paragraph 1530 (b) (4) at the rate of 12½ per centum ad valorem, as amended, *supra*.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry and refund duties to the extent indicated, in accordance with law.