(C.D. 3093)

ABERCROMBIE & FITCH CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 28, 1967)

*Allerton deC. Tompkins* for the plaintiff.

*Carl Eardley,* Acting Assistant Attorney General (*Charles P. Deem* and *Arthur E. Schwimmer,* trial attorneys), for the defendant.

Before WATSON and BECKWORTH, Judges

WATSON, Judge: The merchandise in the case at bar, invoiced as "Sheepskin Coats," was manufactured by Morlands of Glastonbury, Somerset, England. It was classified under paragraph 1519(e) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 25 per centum ad valorem as articles manufactured wholly or in chief value of fur. Plaintiff claims the involved sheepskin coats properly classifiable at the rate of 15 per centum ad valorem under paragraph 1531 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, either directly, or by similitude (paragraph 1559(a) of the tariff act, as amended) to manufactures of leather, or of which leather is the component material of chief value.

The pertinent parts of paragraph 1519(e) and paragraph 1531, as modified, and paragraph 1559(a) of the tariff act, as amended, *supra,* read as follows:

[Par. 1519(e).] Articles, wholly or partly manufactured (including fur collars, fur cuffs, and fur trimmings), wholly or in chief value of fur, not specially provided for:

    *       *       *       *       *       *       *

    Other _____ 25% ad val.

[Par. 1531.] Manufactures of leather except reptile leather, * * * or of which leather (except reptile leather) * * * is the component material of chief value, not specially provided for * * *:

>     * * * wearing apparel_____ 15% ad val.

Par. 1559 (a) Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any non-enumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

Plaintiff alternatively claims that the merchandise is classifiable under paragraph 1558 of the tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52827, at the rate of 10 per centum ad valorem covering articles manufactured in whole or in part, not specially provided for.

The record herein consists of the testimony of two witnesses called by the plaintiff and certain exhibits received in evidence. Plaintiff's collective exhibit 1 is a catalog entitled "Morlands Sheepskin Coats" containing one photograph each of the ladies' and men's sheepskin coats here under protest. Plaintiff's illustrative exhibit 2 is a representative sample of the men's sheepskin coats in question, with the exception that the coats in the case at bar have sewn-in pockets, while the sample in evidence has loose flap pockets (R. 8). Plaintiff's exhibit 3 is "a piece of suede leather shearling" (R. 9), a piece of sheepskin (R. 10), the same as that used in making the coats in question (R. 10).

Plaintiff called as its first witness Mr. Derck Hillman Waters, North American representative of Morlands company who stated that he has been affiliated with the manufacturer since February 1957. He testified that he is personally familiar with the manner in which the two items here under consideration are produced, having seen the skins being prepared in the tannery and also having seen the coats being made from the skins. (R. 5–6.) The witness stated that the skin in the imported coats is known as suede, describing the latter as "the treatment of the skin by means of an abrasive wheel to raise a fine nap on the surface." (R. 8–9.) He described plaintiff's exhibit 3 as a piece of suede leather shearling, stating that a shearling "is a skin from a sheep that has been shorn once," it appearing that the hide is taken off with the wool on it at that time. (R. 12–13.)

The process employed in the production of plaintiff's exhibit 3 was described by plaintiff's witness substantially as follows:

First, the raw skin is cleaned by soaking in cold water, in order to loosen all the dirt, blood, and other impurities that are in the skin. The skin is then washed in hot detergent, and fleshed, which process involves scraping all the fatty connective tissues and pieces of loose skin from the inside of the skin. At this stage, the skin is washed again, dried, and then pickled in a mixture of sulfuric acid and salt, which both preserves the skin temporarily and opens the pores of the skin to receive the tanning fluids. The skin can then be inspected to decide which type of product it is most suited for. At this point, which is the end of the second process, the skin is soft. (R. 13–14.)

The third part is the tanning process itself. (R. 14.) The skin is washed free of the pickle solution, immersed in chrome salts for the required length of time, removed and dried. It is then "retanned," that is, the surface of the skin has the chrome scraped from it, and a vegetable tanning agent is applied, the purpose being to produce a finer suede. The skin is then dried, and de-greased to make it commercially acceptable which completes the third part of the process, at which point the skin is "irreversibly" tanned, that is, is permanently tanned, and cannot deteriorate. (R. 14–15.) "It then becomes leather." (R. 16.)

The fourth process is the final processing. The leather side is wheeled on a sandstone grinding wheel to produce the suede finish required, and the skin is then dyed to whatever color is desired. All that remains is to comb and clip the wool in order to remove any knots or tangles present. The skin is then measured and put into storage. (R. 16–17.)

Mr. Waters further testified that all the processes theretofore described do not in any way affect the wool side; that the tannages used are designed to react chemically with the leather, but not with the wool. (R. 17.) He then stated that the finished product is a suede leather sheepskin. (R. 18.)

Plaintiff's witness testified that, although he had never seen the processes employed in making fur skins and furs, he knew, however, "in general terms" how it was done. With that explanation, Mr. Waters was permitted by the court to explain the processing of furs, as distinguished from the processing of wool. He thereupon testified as follows:

A. The basic operation in preparing a fur is to produce the finest possible appearance of the fur itself. The skin part of the article is incidental. The majority of furs that are currently processed are dressed on what is known as the Leipzig method. This is a treatment of alum salt and sulfuric acid, together with a heavy application of grease. The basic processes of fur processing are somewhat similar to

those of the sheepskin. In other words, the furs are washed, dried, treated with the Leipzig process, dried again, combed, and then the fur is ironed, or polished.

\* \* \* \* \* \* \*

A. \* \* \* What I meant was the initial processing is somewhat similar between a fur skin and a sheepskin. In other words, the raw skin has to be cleaned up and prepared, for either dressing or tanning, as the case may be. Once that stage is reached, then the two processes differ. The sheepskins are tanned in this chrome solution, and degreased. The fur skins are greased by the Leipzig method, and heavily greased. Subsequent processing of a fur skin is designed to improve the luster of the fur itself, the subsequent processing of the sheepskin is designed entirely to produce the finest possible suede on the suede side.

Q. Is the suede on the suede side the exterior portion that is exposed in the garment as they are before the Court?—A. Yes. [R. 20–21.]

Plaintiff's witness testified that the suede side is the commercially important part of plaintiff's exhibit 3 (R. 21–22), and that the purpose of tanning an article like plaintiff's exhibit 3 is to preserve the skin and also to enable the fine suede to be produced on the leather. (R. 23.) After the coat has been made, the suede is sprayed to prevent damage from snow or rain. (R. 23.)

Referring to the making of merchandise like plaintiff's exhibits 1 and 2 from shearlings like plaintiff's exhibit 3, Mr. Waters testified:

To make a coat from the shearling, a cutter collects six or eight skins, which have to be matched both for the color of the outside and also according to the texture of the wool, and cuts out the component parts from patterns. The skeleton of the coat is then sewn and returned to the cutter for preparation of pockets, button holes, and collar. The bindings are then applied, and the coat is sent for inspection. Once the coat has been finished, it is sprayed with the water repellent, and that finished the coat for commercial usage (R. 23–25.)

On cross-examination, Mr. Waters stated that, based upon his experience with the manufacturer herein, it was his belief that sheepskins and fur skins are two separate and distinct commercial products. (R. 32.)

In the determination of the proper classification of the involved merchandise, the decision of the court in the case of *Loewengart & Co.* v. *United States*, 51 Cust. Ct. 1, C.D. 2405, affirmed in *Same* v. *Same*, 53 CCPA 78, C.A.D. 880, is deemed pertinent. The merchandise there involved consisted of a quantity of India-tanned goatskins, which had been subjected to a tanning process in India before exportation. The imported skins were classified under the provisions of paragraph 1530(c) of the Tariff Act of 1930 at the rate of 10 per centum ad valorem as "vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or

sheep skins).'' Plaintiff therein claimed the merchandise properly free of duty under the provisions of paragraph 1765 of the Tariff Act of 1930 as ''Skins of all kinds, raw, and hides not specially provided for.'' In the *Loewengart* case, *supra*, both parties introduced testimony of several witnesses which the Customs Court summarized as follows:

\* \* \* In substance, the witnesses for the plaintiff testified that, although the merchandise before the court is commercially known as India-tanned goatskins (R. 111–112; 139–141; 161; 174), yet, it is not vegetable-tanned rough leather, but still raw hides or skins. The reason given by plaintiff's witnesses for this opinion is that the processes to which the skins were subjected in Indian (R. 26–49) before exportation consisted only of such treatment as was essential for the preservation of the merchandise for transportation to the United States; that the tanning procedures followed in the treatment of the skins served only to preserve them and not to tan or convert them permanently into leather. The witnesses stated that the India-tanned goatskins in this case, in their imported condition, were not usable as leather, but that they had to be ''stripped,'' so as to remove therefrom all the materials which had been applied to them before their shipment from India, and that such stripping was for the purpose and had the effect of returning these skins to a completely raw state, and that, from said raw state, they were tanned into leather in this country. On the other hand, the defendant's witnesses testified definitely that the imported skins consisted of India-tanned goatskins, which had been converted into rough leather, and that the tanned skins could not, by the stripping process described by plaintiff's witnesses, be returned to the raw state. Without exception, defendant's witnesses testified that the treatment to which the goatskins were subjected in India constituted a definite tanning process, by which the skins were permanently converted into rough leather, and was not, as stated by plaintiff's witnesses, a mere preservative process having no permanent effect on the skins.

In its decision in the *Loewengart* case, *supra*, this court was of the opinion that the exhibits there introduced as representative of the India-tanned goatskins ''clearly have the appearance of leather and not that of raw skins,'' and regarded the exhibits as supporting the testimony of the Government rather than that of the importer. The court thereupon concluded that the importer in the above cited case had failed to prove that the merchandise in question was raw skins and that ''the evidence, taken as a whole, by great preponderance, supports the collector's classification of the India-tanned goatskins \* \* \*.''

In affirming the decision of this court, our appellate court (C.A.D. 880), page 80, stated:

\* \* \* In the first place, we agree that Exhibits 1–A, 1–B and 2 clearly have the appearance of leather rather than raw skins. Those exhibits, when taken with the testimony of record and the examples of untanned goatskins introduced by the Government, constitute potent witnesses in support of the collector's classification. *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676; *Coro, Inc.* v. *United States*, 41 CCPA 215, C.A.D. 554.

Although appellant's witnesses testified in substance that the vegetable tanning process to which the imported goatskins were subjected constituted only a preservation process and did not convert the skins permanently to rough leather, the weight of the evidence is clearly on the side of the Government's witnesses that the treatment did permanently convert the skins into rough leather.* * *

The appellate court in the *Loewengart* case, *supra*, further found that the so-called "stripping" process to which the imported skins were subjected could not restore the skins to their condition prior to tanning in India.

The significant factors upon which the appellate court in the *Loewengart* case, *supra*, predicated its determination that the skins there involved were, as held by the Customs Court, "vegetable-tanned rough leather," are present in our opinion, in the case at bar. In the first place, we are persuaded by an examination of plaintiff's illustrative exhibit 2 that the coats under consideration are composed of leather, whether or not the wool is still attached. In the latter connection the wool portion of the involved articles concededly has no separate existence (R. 12) and is still in its attached-to-the-skin condition. As such, it has no separate value other than as an integral part of the tanned skin or leather. It further appears in this record that all the processes employed in the production of the coats in question do not in any way affect the wool side.

The distinctions as to "leather" and "fur" made by plaintiff's witness Waters who, as heretofore indicated, was familiar with the manner in which the involved items are produced, further support, in our opinion, a determination that the coats in question are not manufactures of fur, as classified, but that they are "suede leather sheepskin coats" (R. 6, 18) and properly classifiable as manufactures of leather, as claimed. The testimony of plaintiff's witness was, as indicated, to the effect that on leather coats, the leather is on the outside and much effort is expended to give the appearance of leather, the preparation of the leather suede costing between 75 and 80 percent of the total production cost of the skin (R. 18), whereas with fur coats, the fur is usually on the outside and every effort is made to produce the finest possible appearance of the fur itself. In the latter case, the skin part is incidental. (R. 20, 42.) The commercially important part of the shearling, as represented by plaintiff's exhibit 3, is the suede part. (R. 21, 22.) In our opinion, the coats in question contain no fur, and the defendant on its part made no attempt to establish that these coats contained fur. In the *Loewengart* case, *supra*, the court pointed out that plaintiff's witnesses therein testified that the India-tanning process there employed was not "reversible." So, too, in the case at bar, plaintiff's witness, after describing the process employed in the

production of plaintiff's exhibit 3, testified that at the completion of the third part of the process, the skin is "irreversibly" tanned, that is, permanently tanned and "It then becomes leather." (R. 16.) There was no testimony offered on the part of the defendant to overcome this conclusion of plaintiff's witness.

In *Stern* v. *United States*, 14 Ct. Cust. Appls. 36, T.D. 41547 (affirming Abstract 49515), the court held that "leather" and "skins" are two different things. In its decision, it stated that leather is made by tanning skins or otherwise dressing them for use, for the purpose, principally of overcoming the tendency to putrefaction, securing suppleness in the material, rendering it impervious to and unalterable by water, and increasing its strength and durability. The processes here employed in the production of the shearling used in the manufacture of the coats under consideration, are those used to produce "leather," as indicated by the court in the *Stern* case, *supra*, and as testified to by plaintiff's witness in the case at bar.

Certain lexicographic authorities also indicate that the treated sheepskins (plaintiff's illustrative exhibit 3) are leather and, accordingly, the involved sheepskin coats are properly classifiable as manufactures of leather.

In "Know Your Merchandise," revised second edition, Isabel B. Wingate, Karen R. Gillespie, and Betty G. Addison, chapter 16, page 339, we have found:

*Sheepskin.* This leather is available, both from American sheep and imported sheep and lambs. Sheepskin leather is generally inexpensive. It is less durable than many other leathers and tends to stretch easily. However, it has many important uses as linings, jackets, handbags, gloves, house slippers, sweat bands for hats, and inexpensive baseballs, mitts and footballs. It is sueded successfully to imitate doeskin, and it is sometimes tanned with some of the wool left on and is then known as sheepskin or shearling leather and used as linings in men's and women's jackets. By use of a chemical which straightens the hair, a fine velvety-textured wool pile may result. This is called electrified sheepskin.

In "Dictionary of Tariff Information," 1924, issued by the United States Tariff Commission under the section of "leather," at page 447, we find:

Shearlings are sheepskins which have a residue of wool—generally one-half to 1 inch in length. They are usually from sheep clipped a month or two before slaughter. Domestic skins as well as those imported from China and the Cape are used. The wool must be cleansed and the skins degreased and any one of several tanning processes may be used. The alum tannage is frequently employed and sometimes gambier or formaldehyde.

Shearlings are used for coats, robes, mittens, long wool dusters, linings, trimmings, and for soles for house slippers.

Plaintiff, in the case at bar, relies mainly upon the holding of the court in *Carey & Skinner, Inc.* v. *United States*, 29 Cust. Ct. 8, C.D. 1436. In that case, there was involved the proper classification of certain "Hair on Calf Leather." Duty was assessed thereon at the rate of 20 per centum ad valorem as a nonenumerated manufactured article under the provisions of paragraph 1558 of the Tariff Act of 1930. Plaintiff relied principally upon the claim that the merchandise was properly dutiable at the relevant rates under paragraph 1530(b)(4) of said act, as modified, as leather made from "Calf or kip skins," not cut into forms suitable for conversion into footwear.

In the *Carey & Skinner* case, *supra*, the samples representing the imported merchandise consisted of small tanned skins, having very short hair on one side of the skin. The skins were of a shape which indicated that they were merely cut from the carcass of the animal and processed by tanning or preserving in some manner. The first witness therein described the process of producing leather from raw hides as follows:

A. * * * the skins come to us from packing houses and have been temporarily cured by the addition of salt to the flesh side of the skin. That dehydrates the skin to a point where a putrefaction does not set in over a short period of time. So, the first operation in the production of leather is to wash the skin free of that salt and then in the production of shall we call it a conventional piece of leather the next preliminary step takes place, which is the removal of the hair from the skin. This is done by the addition, by immersing the skin in a solution of calcium hydroxide to which may be added other materials such as sodium sulfide or arsenic to speed up the process. After the hair has come loose, which can best be explained by saying that the hair is originally imbedded in a hair follicle which may extend a fraction, a very small fraction of an inch below the surface of the skin. That follicle is more or less dissolved and the hair becomes loose. Then the lime, which by immersion enters the skin, is next washed out. * * * The skin is at that point transferred into leather by the addition of, * * * a chromium salt and by leaving the skin immersed in a revolving drum for a period of a day the raw skin is transferred to leather. * * * The witness explained that the only difference in the skins before the court, and the process of tanning described, is that the second operation is omitted.

All of the witnesses on examining the skins in question identified them as skins of the unborn calf which had been chrome-tanned into leather. Leather was described as animal skins which will no longer decompose. The witnesses were further agreed that whether the calfskins in question had hair thereon or not, they represented chrome-tanned leather and that such leather was chiefly used as upper calf leather in

the manufacture of shoes; and that the hair on the leather did not affect its status as leather.

The court in the *Carey & Skinner* case, *supra*, in its decision, page 11–12, stated:

The evidence is uncontradicted that the hair-on calfskin in question is a well-known kind of leather which has not been cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear. Webster's New International Dictionary, as well as Funk & Wagnalls New Standard Dictionary, defines leather as the skin of an animal when tanned or otherwise dressed for use. The uncontradicted testimony relative to the hair-on calfskins in question brings them directly within such common meaning.

Accordingly, the court held the calfskins therein involved properly dutiable under paragraph 1530 (b) (4) of the tariff act, as modified, at the rate of 12½ per centum ad valorem, as "upper" leather made from calfskins, not cut or in any forms or shapes suitable for conversion into boots, shoes, or footwear, as claimed.

In the *Carey* case, *supra*, as in the present case, the skin of the animal had been tanned without the removal of the hair. This court found therein that the material was a "leather" for tariff purposes. For reasons similar to those advanced in the cited case, we are of opinion that the material used to produce the imported coats are suede leather shearlings.

Counsel for the defendant in the case at bar directs our attention to the case of *Ayres, Bridges & Co. et al.* v. *United States*, 8 Ct. Cust. Appls. 87, T.D. 37201; *Bloomingdale Bros.* v. *United States*, 8 Ct. Cust. Appls. 104, T.D. 37221; and *Domestic Broadtail Producers, Inc.* v. *United States*, 2 Cust. Ct. 32, C.D. 81, as authority for the proposition that sheepskin is fur for tariff purposes if it is used directly in the manufacture of articles such as coats, the wool portion not being removed for separate use.

In the *Ayres, Bridges* case, *supra*, the merchandise covered by many of the protests therein consisted of a variety of skins of different animals on which the collector assessed duty at the rate of 30 per centum ad valorem under paragraph 348 of the Tariff Act of 1913 as "furs dressed on the skin, not advanced further than dyeing"; and as to that covered by the remainder of the protests at different rates of duty under the same paragraph as "fur articles or fur materials in a variety of shapes and conditions." The appellants therein claimed the merchandise properly free of duty under paragraph 650 of the said act as "wool of the sheep, hair of the camel, and other like animals, and all wools and hair on the skin of such animals"; that if not entitled to free entry the merchandise was dutiable under paragraph 286 of the

act as "other wool and hair which have been advanced in any manner or by any process of manufacture beyond the washed or scoured condition." The court in the *Ayres, Bridges* case, *supra*, observed that it appeared therein that the only merchandise the classification of which was there contested, was in fact "the skins of sheep animals or parts of the same with the natural growth thereon, the flesh side of which has been dressed, rendering the same soft and pliable." The customs examiner of the involved merchandise called on behalf of the importers, testified that the use of skins similar to those in question, was as coat linings for men's coats; that skins such as those involved were also handled by furriers who made such skins into garments and that skins of the character in question had been, when dressed, or dressed and dyed, regarded for customs purposes as dressed furs on the skin. Two other witnesses for the Government, engaged in the importing of furs, testified to the effect that the skins under consideration were known as "fur" skins in the wholesale trade. The testimony of some of the other witnesses for the appellants was directed mainly to a showing that the trade did not include such China sheep and lamb skins in the definition of "furs," which was accepted in the trade as "the valuable skin of an animal with fine fur on it, such as the fox, the squirrel, the skunk * * *," and that in the trade the use of any particular skin had nothing to do with the question of whether or not it was a "fur" skin.

The court in the *Ayres, Bridges* case, *supra*, page 93, stated the issue therein as follows:

This raises the question of whether sheep or lamb skins dressed with the wool thereon are or are not furs or fur skins in the common acceptation of the term. * * *

After reviewing a number of authorities on the question before it the court therein, page 94, stated:

One import of these decisions is that the term "fur" or "furs" or "fur skins" was not in common understanding necessarily limited to products of strictly fur-bearing animals and that the skins of animals of the sheep kind carrying a relatively short growth of wool thereon and not commerically valuable as wool or designed to be used as such, were not dutiable under the wool provisions of the act of 1909 but were because of their exclusive use in the manufacture of what are ordinarily known as furs or fur articles, deemed to be for tariff purposes furs in fact that the trade had come to so regard them.

and in commenting upon paragraph 348 of the relevant tariff act for "furs dressed on the skin," page 95, further stated:

* * * dressed skins of animals, other than those of the strictly fur-bearing species and including those of the sheep kind, should be classified thereunder as furs dressed on the skin or as manufactures of furs

whenever it appeared that they were, if skins of the animals of the sheep kind, designed for such use were so used, coupled probably with the qualification that at least in the case of skins of sheep animals they should not carry so great an amount of wool thereon as to render them practically and commercially wool and make it commercially practicable that the wool thereon should be removed therefrom and used for the various purposes to which wool, as such, ordinarily is devoted.

Indeed, we have little hesitation in saying that in their common meaning the terms "fur," "furs," and "furs dressed on the skin" include the dressed skins of animals of the sheep kind when such skins are in fact designed and wholly or chiefly devoted to the manufacture of furs or fur articles such as coats, muffs, neck pieces, etc. So far as we can see such skins serve all the purposes of fur and the well-known scarcity and the cost of many skins of the so-called true fur-bearing animals has resulted in their widespread and general use in the manufacture of what are commonly known as fur. garments or articles, or garments and articles composed in part of fur. Manifestly, however, as already stated, such a meaning would be applied to the skins that carry a relatively short growth of wool or a growth not relatively and commercially valuable if separated therefrom.

\*          \*          \*          \*          \*          \*          \*

The condition of the merchandise here, so far as shown by the exhibits, militates strongly against the contention of the importers that it is to be regarded as wool or hair or a manufacture thereof for any tariff purpose or in any tariff sense. These skins have all been dressed on one side, rendering them soft and pliable. The growth on the other side in the main is not of considerable length, which suggests that they are not imported for wool or hair purposes as such, because, if so, the dressing was unnecessary. They have been apparently designed and set apart for fur uses and are appropriate therefor. \* \* \*

The situation in the *Ayres, Bridges & Co.* and *Domestic Broadtail Producers, Inc.*, cases, *supra*, is distinguishable, in our opinion, from that in the case at bar. There, the involved skins were imported for use as ordinary fur skins are used. The competition there was between "wools" and "fur" skins. Here, the controversy is between articles, wholly or in chief value of fur (Par. 1519(e)) and manufactures of leather (Par. 1531). The essence of the court's holding in both the cited cases was to the effect that certain animal skins with the wool or hair on, when it is not profitable to separate the wool or hair from the skin and use it for wool or hair purposes, are not within the terms "wool" or "hair" for tariff purposes. That is not the issue with which we are here involved. Further, the important consideration in both of the above cited cases was predicated, in our opinion, upon the dedication of the merchandise there involved for use as a "fur" and the fact that it was regarded in the trade as fur. Specifically, in the *Domestic Broadtail* case, *supra*, the record therein disclosed that the

involved sheepskins "were processed into furskins, known as American broadtail." It has not been established in this record that the imported coats were manufactured of "fur" skins.

In the case at bar, the record supports, in our opinion, a finding that the sheepskins from which the imported coats have been manufactured have been processed to such an extent that they have become "leather," and are used like leather and not as ordinary fur skins are used. The holding in these two cited cases is not controlling in the determination of the issue here before us.

The *Bloomingdale Bros.* case, *supra*, is likewise distinguishable from the case at bar. There, the merchandise consisted of yarn made from the hair of the Angora rabbit which was classified under paragraph 348 of the Tariff Act of 1913 as a manufacture of fur. In holding the merchandise properly classifiable under paragraph 307 of the said act as "Yarns made of the hair of the Angora goat, Alpaca, or other like animals," as claimed, the court in its decision, page 106, stated:

\* \* \* If the hair is so short that it is commercially unfit to be spun into yarn or for the making of textiles, and is chiefly employed in the making of furs or fur garments, or for other fur uses, it is that kind of hair which is known as fur, though it be taken from the back of a sheep. If, on the other hand, the hair possesses all the characteristics of fur, but is so long and of such quality that it can be spun into yarn and converted into cloth and is chiefly used for that purpose, it should be classified as a wool or as hair other than fur. As the hair of the Angora rabbit is chiefly, if not exclusively, used for the making of yarns, and as the making of yarn is not, properly speaking, a fur use, we think it may be safely concluded that the material out of which the importation was made is not fur and the merchandise in issue must therefore be regarded as a manufacture of some other kind of hair.

In the *Bloomingdale Bros.* case, *supra*, the court again set forth the distinction between the terms "fur" and "wool" for tariff purposes. The question whether the merchandise there involved was a manufacture of leather was not under consideration in that case, and the specific holding therein is likewise not determinative of the proper classification of the merchandise here in question.

For all of the reasons heretofore stated, we hold the involved merchandise properly dutiable under paragraph 1531 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, at the rate of 15 per centum ad valorem as manufactures of leather, as claimed. In view of our finding herein, we deem it unnecessary to discuss plaintiff's alternative claim under paragraph 1558 of the

Tariff Act of 1930. The protest claim under the above-referred to paragraph 1531 is sustained.

Judgment will be entered accordingly.